IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ESTATE OF ALLEGRA WARNICK,
Deceased                                                                        PLAINTIFF

v.                              Civil No. 2:25-cv-02085- MEF

BENTON COUNTY, ARKANSAS;
SHAWN HOLLOWAY,
Benton County Sheriff;
OFFICER RILEY MCCARVER,
Rogers Police Department;
OFFICER KADEN DICKSON,
Rogers Police Department; and the
CITY OF ROGERS, ARKANSAS                                                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are a Motion to Dismiss filed by Officer Riley McCarver ("Officer McCarver"), Officer Kaden Dickson ("Officer Dickson"), and the City of Rogers, Arkansas' ("City of Rogers"), and a Motion for Judgment on the Pleadings filed by Benton County Sheriff Shawn Holloway ("Sheriff Holloway") and Benton County, Arkansas' ("Benton County"). (ECF Nos. 26, 35). The case is before the undersigned by consent of the parties. (ECF No. 29, ¶ 11). Plaintiff has filed responses in opposition to both motions, and said motions are ripe for resolution. (ECF No. 32, 37).

## I.      BACKGROUND

Trenton Reick, Special Administrator (ECF No. 2-1), brings this cause of action on behalf of the Estate of Allegra Warnick, deceased, pursuant to 42 U.S.C. § 1983, the Arkansas Civil Rights Act § 16-123-101, et seq, and the Arkansas Constitution for the alleged wrongful death of Allegra Warnick ("Ms. Warnick") while detained at the Benton County Detention Center. (ECF No. 2). Plaintiff insists that all Defendants are liable for Ms. Warnick's death due to deliberate indifference

to her medical needs and violations of her constitutional right to receive medical care.  Further, the Plaintiff raises claims of intentional infliction of emotional distress for their failure to respond to Ms. Warnick's pleas for help and requests for medication.

In support of their Motion to Dismiss, the City of Rogers and Officers Dickson and McCarver attached a copy of Officer Dickson's body worn camera footage documenting the Officers' contact with Ms. Warnick.  (ECF No. 27-1).  Plaintiff has raised no objection to the entry of this video, there is no question as to its authenticity, and the undersigned deems the video to be "necessarily embraced by the pleadings." *See Waters v. Madson*, 921 F.3d 725, 732 n.2 (8th Cir. 2019) (citing *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).  Although not specifically mentioned in the Complaint, Plaintiff's allegations are clearly based on events depicted in said video. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).  Accordingly, we will consider it together with the pleadings, supplementing the factual discussion with information from the body camera video.[1] *See Aumick v. Berkshire*, 2021 WL 12271641, *1 (W.D. Mo. July 12, 2021).

On February 4, 2025, at around 2:58 p.m., Rogers Police Officers McCarver and Dickson were dispatched to the Casey's gas station on Hudson Road in Rogers, Arkansas, to perform a welfare check on a woman sitting in front of a fuel pump.[2]  (ECF Nos. 2, 27).  A witness told officers that the woman had indicated she was "coming down off something hard" and needed help.  (ECF. No. 2, ¶ 9).

---

[1] The body camera video is timestamped.  Therefore, the Court will refer to various points in the video based on the timestamp.

[2] Officer McCarver's trainee was also in attendance but is not named as a party in this lawsuit. (ECF No. 2, ¶ 12).

2

Upon arrival, Officer Dickson approached the woman while Officer McCarver remained in his vehicle.  The woman was seated on the ground near fuel pump 10 rocking back and forth and cradling a dog between her legs.  (ECF No. 27-1, *Officer Kaden Dickson's Body Worn Camera Video*, at 0:00:27).  She wore a black 3/4 zip sweater, green pants, and soiled yellow socks with no shoes.  When asked if she had shoes, the woman indicated that it was a long story.  (*Id*. at 0:01:55).  Her hair was disheveled, her sweater was covered in dog hair, and she had either dirt or marks on her face.  (*Id*. at 00:00:27, 0:29:25).  Beside her lay a pink dog harness, a black plastic bag with a bottle inside, and a Styrofoam food container with a spoon on top.

The woman ultimately identified herself as Allie Warnick and provide her date of birth, although she did not have any identification.  (ECF No. 27-1, 0:02:13; 0:05:13).  Dickson advised Ms. Warnick that Casey's wanted her off its property.  She asked several times if Dickson could give her a ride to her friend's or boyfriend's house, but Dickson explained that he was not allowed to transport her anywhere except jail.  (*Id*. at 0:01:45, 0:02:55, 0:04:28, 0:10:28, 0:35:10).

Dickson asked dispatch to run her information through their database, and it was discovered that she had an outstanding warrant out of Franklin County, Arkansas.  While awaiting confirmation that Franklin County did in fact want Ms. Warnick transported, Dickson asked her a series of questions concerning her use of intoxicants.  Ms. Warnick indicated that she had a little to drink that day but did not use drugs.  (*Id*. at 0:10:16).  When pressed concerning the amount of alcohol consumed, she replied, "not enough."  (*Id*. at 0:13:36).

Dickson informed Ms. Warnick that she had a warrant.  (ECF No. 27-1, 0:11:54).  She asked if he would agree not to arrest her if she could find a ride.  (*Id*. at 0:12:51).  Upon confirmation that Franklin County did want her transported to the Benton County Detention Center, Ms. Warnick gave a litany of reasons why she could not go to jail.  Her reasons included

having had a fight with her boyfriend and needing to smooth things over with him, concern for her dog and its puppies, business at the casino in Siloam Springs, and needing her medication. (*Id.* at 0:14:20, 0:16:11, 0:17:33, 0:18:24, 0:19:11, 0:19:20, 0:20:54). When Dickson inquired about her medication, Ms. Warnick indicated that she takes Ativan, and that it was at her boyfriend's house. (*Id.* at 0:19:20). Dickson did not appear to be familiar with the medication, mispronouncing it as Adderall, and opined that he did not think it was a life-or-death medicine. (*Id.* at 0:19:37). Ms. Warnick said she needed to take her medication because she experienced "alcohol withdrawals and stuff." (*Id.* at 0:19:35; 0:26:32).

Someone from the animal shelter arrived and picked up the dog. (ECF No. 27-1, 0:27:45). Thereafter, Dickson placed Ms. Warnick in the patrol car and collected her belongings, which included a bottle later determined to contain vodka. (ECF No. 27-1, 0:29:25). During the transport to the jail, Ms. Warnick continued to try and bargain with Dickson not to take her to jail. It is difficult to hear her quiet voice over the radio, police radio, and road noise, but she did mention her medication at least twice. (*Id.* at 0:40:40). They arrived at the Benton County Detention Center at 4:10 p.m., and Dickson escorted Ms. Warnick into the intake area. (*Id.* at 0:57:15; 1:00:22). Ms. Warnick was able to walk on her own. As they walked down the hall, she said, "I told you I have medicine to take." (*Id.* at 1:02:25). Dickson responded, "Ok. Cool."

When Ms. Warnick began mumbling and making nonsensical statements, Dickson placed his hand on the center of her back and guided her to the booking room. (ECF No. 27-1, 1:03:09). At 4:17 p.m., an intake jailer asked Dickson to turn off his body camera and he complied. (*Id.* at 1:04:06). Dickson's bodycam ends at this point and neither party has submitted video from the Benton County Detention Center.

According to the Complaint, Dickson noted no alcohol and no drugs on her arrest report. Thereafter, Ms. Warnick was allegedly unable to complete the booking process and placed in a drunk tank. (ECF No. 2, ¶¶ 20, 29). On February 5, 2025, Sheriff Holloway advised Ms. Warnick's father that she had refused breakfast at 6:00 a.m. that morning and deputies found her unresponsive in her cell at 6:30 a.m. (*Id*. at ¶¶ 21, 22). At 7:09 a.m., an officer with the Bentonville Police Department entered the booking area to serve a warrant and observed deputies with Ms. Warnick. Said officer requested EMS and stated that jail staff advised they had administered Narcan. (*Id*. at ¶¶23, 24). Ms. Warnick was transported to the hospital and later pronounced dead. (*Id*. at ¶¶ 28, 30).

Plaintiff filed suit on August 13, 2025. (ECF No. 2). On September 11, 2025, Rogers Police Department filed a Motion to Dismiss for Failure to State a Claim, claiming the Rogers Police Department was not an entity subject to suit. (ECF No. 8). Benton County and Sheriff Holloway filed an answer on September 16, 2025. (ECF No. 12).

Pursuant to Plaintiff's Motion to Substitute the City of Rogers for Rogers Police Department (ECF No. 15), the Court terminated Rogers Police Department as a defendant on September 29, 2025. (ECF No. 18). As such, their Motion to Dismiss for Failure to State a Claim (ECF No. 8) was deemed moot. (ECF No. 24).

The City of Rogers and Officers Dickson and McCarver filed a Motion to Dismiss for Failure to State a Claim on November 17, 2025, contending that neither officer was deliberately indifferent to Ms. Warnick's medical needs or violated her constitutional rights; both officers were entitled to qualified immunity; the Plaintiff has not stated a claim against the City of Rogers; and the Plaintiff has not sufficiently alleged a claim for the intentional infliction of emotional distress. (ECF No. 26). On December 1, 2025, the Plaintiff filed a Response in Opposition to said motion,

arguing that the officers were deliberately indifferent to Ms. Warnick's objectively obvious serious medical needs, as she is seen rocking back and forth, mumbling, and repeatedly asking for help; the officers mocked her condition and made jokes about her inability to answer questions and ignored her pleas for help; and illegally seized Ms. Warnick and took her to jail rather than seeking out medical attention. (ECF Nos. 32, 33). Asserting municipal liability under 42 U.S.C. § 1983, Plaintiff further insists that the City of Rogers is also responsible for the officers' indifference because it ratified the officers' behavior by failing to discipline them for their actions.

On February 9, 2026, Benton County, and Sheriff Holloway filed a Motion for Judgment on the Pleadings seeking dismissal because the Plaintiff has failed to allege the existence of an unconstitutional official policy as is required to establish a claim against the County; and has not pled sufficient facts to establish the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; an injury by acts pursuant to the governmental entity's custom, inadequate officer training practices; deliberate indifference to the rights of others in adoption of those training practices; and that said failure to train resulted in a constitutional violation. (ECF Nos. 35, 36). Additionally, Sheriff Holloway contends he cannot be held liable under the theory of *respondeat superior* because the Plaintiff has not shown that he received notice of a pattern of unconstitutional acts committed by his subordinates, demonstrated deliberate indifference to or tacit authorization of the offensive acts, or failed to take sufficient remedial action proximately causing injury to Ms. Warnick. Plaintiff filed a Response in Opposition to said motion, maintaining that Sheriff Holloway is liable because he was personally involved in the care and custody of Ms. Warnick.

## II.    APPLICABLE LAW

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement...showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This requirement of facial plausibility means the factual content of a Plaintiff's allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

The Court must grant all reasonable inferences in favor of the non-moving party.  *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).  However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted.  *See Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022) (citing *Twombly*, 550 U.S. at 562).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Thus, Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.  "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice."  *Hamilton v. Palm*, 621 F.3d 816, 817-18 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Although courts must accept all factual

allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677-78.

Similarly, a court may grant a Rule 12(c) motion for judgment on the pleadings "when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006). When ruling on a motion for judgment on the pleadings, the court applies the same standard it would use to address a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). "[T]he pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record" are considered. *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citation omitted).

### III.   DISCUSSION

#### A.   Motion to Dismiss

In the Complaint, the Plaintiff asserts that Officers Dickson and McCarver were deliberately indifferent to Ms. Warnick's serious medical need when they failed to request an EMS check prior to her arrest despite obvious signs of both mental and physical distress and knowledge that she was "coming off something hard"; ignored her pleas for help and statements that she needed her medication; mocked and made fun of her; and noted no alcohol or drugs on her arrest report despite the fact she told them she had consumed some alcohol that day and possessed a half-gallon of vodka at the time of her arrest. The officers and the City of Rogers insist the Plaintiff has failed to plead facts sufficient to show that the officers were deliberately indifferent to Ms. Warnick's medical needs and/or violated her constitutional rights. As such, they assert the

affirmative defense of qualified immunity.  Further, they contend the Complaint lacks sufficient evidence to establish a claim for intentional infliction of emotional distress.

### 1.    Deliberate Indifference

Deliberate indifference claims are analyzed under the Fourteenth Amendment's due process clause, relying on both Fourteenth and Eighth Amendment cases alike.  *Poemoceah v. Morton County*, 117 F.4th 1049, 1055 (8th Cir. 2024); *Hott v. Hennepin County*, 260 F.3d 901, 905 (8th Cir. 2001).  "A plaintiff claiming deliberate indifference must establish objective and subjective components."  *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013).  "The objective component requires a plaintiff to demonstrate an objectively serious medical need," while "[t]he subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need."  *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)).  This latter component requires the official to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "[T]he district court can infer knowledge if the risk was obvious."  *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (collecting cases).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (internal quotations omitted).  "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [detainee's] health."  *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (internal quotations and citations omitted).  The Eighth Circuit has stated that this

"onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Thompson*, 730 F.3d at 747 (internal quotations and citations omitted). Thus, behavior to include passing out in the booking area, nearly falling out of the seat, an inability to sign their name and answer questions, and an inability to answer questions about their medical needs has been found to constitute objective evidence of a serious medical need. *Id.* at 749; *Barton*, 908 F.3d at 1124. On the other hand, knowledge that a detainee has taken methamphetamine standing alone does not. *Grayson v. Ross*, 454 F.3d 802, 810 (8th Cir. 2006).

In the present case, there is no contention that a doctor has diagnosed Ms. Warnick with a serious medical need that required treatment. Thus, we must determine whether it would be obvious to a layperson that Ms. Warnick required immediate medical attention at the time Officers Dickson and McCarver first contacted her, when Dickson transported her to the jail, and/or when Dickson booked her in at the Benton County Detention Center. Accepting Plaintiff's facts as true, we will assume the officers knew Ms. Warnock was "coming down off something hard." When they arrived on scene at the Casey's, Ms. Warnick was sitting on the ground in front of a gas pump, cradling her dog in her lap, and rocking back and forth. She explained that she had walked away after having an argument with her boyfriend. Except for shoes, she appeared to be appropriately dressed, wearing a 3/4 zip sweater, pants, and socks. Her soiled yellow socks resembled the socks provided by a hospital, reinforcing the officers' suspicion that Ms. Warnick was under the influence of something. Likewise, the vodka found in the plastic bag sitting next to Ms. Warnick alerted them that she had also consumed alcohol; however, when Dickson asked her what she had taken, she denied taking anything. In fact, she stated that she did not use drugs. Ms. Warnick did admit to consuming some alcohol, but she did not quantify the amount consumed other than to say it was

10

"not enough."  *Id*. (jailer did not know inmate required medical attention although he had knowledge inmate was likely under influence of methamphetamine where inmate would not answer questions about his drug use).

Despite her obvious intoxication, Ms. Warnick was able to recite her name and date of birth.  Although she did not appear to fully understand the reason for her arrest and seemed preoccupied with her dog's safety, getting to her friend's house, and smoothing things over with her boyfriend, she did understand that she was being arrested.  Ms. Warnick did not mention anything about her medication to the officers until after Dickson informed her that she was being arrested on an outstanding warrant.  She told Dickson that her medication was at her boyfriend's house and that it was important because she experienced alcohol withdrawals.  However, Ms. Warnick did not continuously request her medication.  Instead, she spent most of the time pleading with Officer Dickson not to take her to jail.

While it was obvious that Ms. Warnick was under the influence of something and experiencing some emotional upset over a disagreement with her boyfriend, we cannot say that it would be obvious to a layperson that she required *immediate* medical attention at any point during her encounter with Officers Dickson and McCarver.  *Id.* at 809 (holding pre-trial detainee, who was found standing next to creek, soaking wet, and reporting that his vehicle was going to "blow up," and who was combative during arrest, did not have objectively serious medical need).  Further, the fact that Ms. Warnick stated she needed her medication because she experienced "alcohol withdrawals and stuff" did not create a presumption that she required immediate medical attention. At the time of her interaction with the officers, she did not exhibit symptoms consistent with moderate to severe alcohol withdrawal.  And, given the fact that she had alcohol in her possession, there was no reason for the officers to assume she was experiencing withdrawal symptoms at that

11

time.  Therefore, a layperson would not leap to the conclusion that Ms. Warnick needed medical attention, even if they were aware that she was intoxicated.

### 2.    Qualified Immunity

Qualified immunity shields officials from liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011).  The court must consider whether, taken in the light most favorable to the plaintiff, the facts show a violation of a particular constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Analysis of a qualified immunity claim is a two-step inquiry: (1) do the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) was that right clearly established at the time of the defendants' alleged misconduct."  *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013) (citing *Saucier*, 533 U.S. at 201).  "[T]he Supreme Court has emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Therefore, to lose the shield of immunity, an officer must have been "plainly incompetent" or have knowingly violated the law.  *Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014) (internal citation omitted).  If "no reasonable fact finder could answer yes to both of these questions," the officer is entitled to immunity.  *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2013).

Officers "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 584 U.S. 100, 104-105 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 14 (2015) (internal quotation marks omitted and emphasis deleted)).  "The dispositive question is 'whether the violative nature of [the] particular conduct is clearly established.'"  *Mullenix*, 577 U.S. at 13 (quoting *Aschroft v. al-Kidd*, 563 U.S. 731, 742 (2011)

12

(emphasis in original)).  And the Plaintiff bears the ultimate burden of proving the law was clearly established.  *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002).

Because there is no evidence of an objectively serious medical need that required immediate medical attention, Officers Dickson and McCarver were not deliberately indifferent to Ms. Warnick's medical needs, did not violate her right to medical care, and are entitled to qualified immunity.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (finding *Saucier* protocol to be beneficial as it is difficult to determine whether a right is clearly established without deciding exactly what the established right is).

### 3.    Municipal Liability

Municipal liability under 42 U.S.C. § 1983 requires proof of an underlying constitutional violation.  If no constitutional violation occurred, the city cannot be held liable, even if its policies or practices were deficient.  *Partridge v. City of Benton, Arkansas*, 2025 WL 3139026, at *2 (8th Cir. 2025) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)); *Rogers v. King*, 885 F.3d 1118, 1122 (2018).

Because we have concluded that Officers Dickson and McCarter did not violate Ms. Warnick's constitutional rights, there is no municipal liability.  Accordingly, Plaintiff's claims against the City of Rogers must also be dismissed.

### 4.    Intentional Infliction of Emotional Distress

In Arkansas, a claim for intentional infliction of emotional distress is also known as the tort of "outrage."  *Patrick v. Tyson Foods, Inc.*, 2016 Ark. App. 221, 17, 489 S.W.3d 683, 695 (2016).  To establish a claim for outrage, a plaintiff must show:

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized

community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*FMC Corp., Inc. v. Helton*, 360 Ark. 465, 484-85, 202 S.W.3d 490, 504 (2005).

Arkansas courts give "a narrow view to the tort of outrage" and require "clear-cut proof to establish the elements in outrage cases." *Id*. Liability attaches only when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. However, "[m]erely describing the conduct as outrageous does not make it so." *Id*.

Here, the Plaintiff has not sufficiently pled that Officers Dickson and McCarter's conduct rose to such an extreme level. We have concluded that it was not obvious to a layperson that Ms. Warnick required immediate medical attention. Therefore, their failure to seek out medical attention for her was not beyond all possible bounds of decency and utterly intolerable. Plaintiff's outrage claim against the officers must also be dismissed.

**B.    Motion for Judgment on the Pleadings**

Plaintiff also asserts claims against Sheriff Holloway and Benton County, for deliberate indifference and failure to provide adequate supervision and training of its agents and employees who were deliberately indifferent to Ms. Warnick's serious medical needs by failing to request a medical assessment of Ms. Warnick upon her arrival at the jail; ignoring her pleas for help; failing to regularly check on her while she was in the drunk tank, and failing to call for EMS when they found her unresponsive. Further, he contends the Defendants ignored the observations of jailers and deputies.

**1.    Sheriff Holloway**

14

A sheriff can be held individually liable under 42 U.S.C § 1983 for constitutional violations arising from his own actions, provided certain conditions are met.  Liability under 42 U.S.C. § 1983 is personal, meaning that a Plaintiff must demonstrate that the sheriff, through his own individual actions, violated the Plaintiff's constitutional rights.  *Iqbal*, 556 U.S. at 676; *Keup v. Sarpy Cnty.*, 709 F. Supp. 3d 770 (D. Neb. Dec. 21, 2023).  In other words, the plaintiff must show that the sheriff either directly participated in the constitutional violation or that his failure to properly supervise or train subordinates caused the violation.  *Elder v. Gillespie*, 54 F.4th 1055, 1065-1066 (8th Cir. 2022) (quoting *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014)).  However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

In this case, the Plaintiff contends that Sheriff Holloway was personally involved in the care and custody of Ms. Warnick as he was in direct control of the Benton County Detention Center while Ms. Warnick was incarcerated.  Sheriff Holloway told her father that she refused breakfast at 6:00 a.m.; at 6:30 a.m. deputies found her unresponsive in her cell and had her transported to the hospital; Ms. Warnick died at the hospital; and he did not report a death in the facility.  Further, he asserts that Ms. Warnick was jailed for 15 hours, in obvious need of medical attention, so distressed she could not be booked, and repeatedly asked for help.  Holloway's staff reportedly failed to administer aid, evaluate her, or check on her during that 15-hour period.  Further, when she was found unresponsive at 6:30 a.m., the jailers administered Narcan but did not call for EMS.  Instead, 40 minutes later, at 7:09 a.m., a Bentonville Police Officer serving a warrant in the facility phoned EMS.  Plaintiff insists either Sheriff Holloway failed to train his employees, or an unwritten policy existed at the jail which Sheriff Holloway tacitly approved.  Accordingly, the undersigned

15

concludes that the Complaint contains enough facts to state the grounds upon which it rests; namely, that Sheriff Holloway's liability is premised on a failure to train and/or supervise his employees.

As such, at this point in the litigation, Sheriff Holloway's Motion for Judgment on the Pleadings must be DENIED.

### 2.     Benton County

"Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).  The Eighth Circuit has stated, "[a] policy can be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Dahl v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010).  Thus, a single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 393 (8th Cir. 2007) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409, (1997)).  For a single violation to trigger municipal liability under this theory, the "need for training or other safeguards" must be "so obvious at the time of this incident that the [defendant's] actions can properly be characterized as deliberate indifference to [the plaintiff's] constitutional rights." *Id.*

Here, the Plaintiff contends that Sheriff Holloway and Benton County's failure to provide supervision and training to its agents and employees directly resulted in the death of Ms. Warnick. If proven, the need for training and other safeguards would be so obvious as to constitute deliberate

indifference to Ms. Warnick's constitutional rights. Accordingly, Benton County's Motion for Judgment on the Pleadings must be DENIED at this stage in the litigation.

### 3.    Intentional Infliction of Emotional Distress

As previously mentioned, the tort of intentional infliction of emotional distress, also known as outrage, requires a showing that the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result from his conduct; the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; the actions caused the plaintiff's distress; and the emotional distress suffered was so severe that no reasonable person could be expected to endure it. *FMC Corp.*, 360 Ark. at 485, 202 S.W.3d at 504. If proven, we find that the alleged actions and/or inactions of Sheriff Holloway and Benton County in failing to watch Ms. Warnick and to promptly request medical treatment on her behalf when she was found unresponsive could rise to the level of outrage. Accordingly, Plaintiff's intentional infliction of emotional distress claim against Sheriff Holloway and Benton County must also remain.

### IV.    CONCLUSION

Accordingly, the City of Rogers and Officers Dickson and McCarver' Motion to Dismiss (ECF No. 26) is hereby GRANTED and those parties are dismissed from the suit. Sheriff Holloway and Benton County's Motion for Judgment on the pleadings (ECF No. 35) is DENIED, and the case will proceed to discovery.

IT IS SO ORDERED on this 23rd day of March 2026.

/s/ *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

17